# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ARABIAN MOTORS GROUP
W.L.L.,

     Plaintiff,

v

FORD MOTOR COMPANY,

     Defendant.

Case No.  16-cv-

Hon.

Mag. Judge

---

Dan Myers
Loula Fuller
Fuller & Myers Attorneys at Law
Co-Counsel for Plaintiff
106 E. College Ave., Suite 1450
Tallahassee, FL  32301
(850) 577-0058
lfuller@fuller-myers.com

John B. Alfs (P39094)
CLARK HILL PLC
Co-Counsel for Plaintiff
151 S. Old Woodward, Suite 200
Birmingham, MI  48009
(248) 988-5841
jalfs@clarkhill.com

M. Brooks Savage
Abed & Savage
Co-Counsel for Plaintiff
1101 Seventeenth Street N.W.
Suite 405
Washington, DC  20036
 (202) 452-1488
mbsavage@abedsavage.com

---

## COMPLAINT

Plaintiff Arabian Motors Group W.L.L. ("AMG"), by and through its undersigned attorneys, for its complaint herein, alleges as follows:

## PARTIES

1.      AMG is a limited liability company organized and existing under the laws of the State of Kuwait with its principal place of business at Pepsi Cola Street, Plot 51, Jahra Road, Shuwaikh, Kuwait.

2.      Defendant Ford Motor Company ("Ford") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan 48126.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of the subject matter of this action under 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

4.      This Court also has original jurisdiction of the subject matter of this action under 28 U.S.C. § 1332(a)(2), in that this is an action between a citizen of a State and a citizen or subject of a foreign nation in which the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over AMG and Ford because AMG subjects itself to this Court by filing this action, AMG and Ford availed themselves of the protection and benefits of the laws of Michigan, and of the United States, by entering into a 2005 Global Importer Dealer Sales and Service Agreement ("GIDSSA") in   the State of Kuwait by virtue of registering the

GIDSSA in the Ministry of Commerce and Industry Register ("Commercial Register") as required by Kuwait law, which by its terms is to be construed in accordance with the laws of the State of Michigan, and by entering into a long-term relationship with each other to do business in Kuwait when Ford is a company headquartered in the State of Michigan.

6.      This Court also has personal jurisdiction over the parties because the parties consented to jurisdiction in the federal courts in the State of Michigan in any action brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq.

7.      Venue is proper in this district pursuant to (a) 9 U.S.C. § 4, and (b) 28 U.S.C. § 1391(a) and (d), in that a substantial part of the events giving rise to the claim occurred in this district and the Defendant's principal place of business is in this district.

## NATURE OF ACTION

8.      This is an action: (a) to enjoin arbitration proceedings that are subject to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq. as to which, pursuant to 15 U.S.C. § 1226, arbitration may be used to resolve the underlying controversies only if after such controversies arise all parties to the controversy consent in writing to use arbitration to settle such controversies, and AMG has not given such consent and will not give such consent; (b) for a declaratory judgment pursuant to 28 U.S.C. § 2201 that, pursuant to 15 U.S.C. § 1226, AMG has no obligation to

arbitrate the controversy between itself and Ford; (c) for an award of compensatory damages on the grounds that Ford breached its agreement with AMG by wrongfully terminating the agreement and engaged in conduct that violates its duty to act in good faith under Michigan law; (d) for an award of compensatory and punitive damages on the grounds that Ford made willful and wanton fraudulent misrepresentations which AMG relied on to its detriment; and (e) for an award of compensatory and punitive damages on the grounds that Ford willfully and wantonly failed to disclose material facts for the purpose of misleading AMG which AMG relied on to its detriment.

## FACTS

### A.      Ford and AMG Establish a Relationship in Kuwait

9.      Ford is the manufacturer of Ford and Lincoln (and formerly Mercury) brand motor vehicles, parts and accessories ("Ford Products").

10.      In or about 1986 Ford determined that it wanted to re-enter the Kuwaiti market and executed an agency/franchise agreement with AMG based, in large part, on the substantial qualifications and successful efforts of AMG's principal, Mr. Hamad M.A.A. Al-Wazzan ("Sheikh Hamad"), to help end the 25-year boycott of Ford Products by Arab League countries, most especially Kuwait. A copy of this agreement is attached as **Exhibit A**.

11.    In 1986 when AMG and Ford entered into their first agency/franchise agreement the parties agreed that AMG would be Ford's sole representative in Kuwait for Ford/Lincoln/Mercury.

12.    By entering into the agency/franchise agreement with AMG to do business in Kuwait , Ford was required and  agreed to comply with the mandatory laws of Kuwait. Ford subsequently reaffirmed that commitment several times, most recently by recording the 2005 GIDSSA in the Commercial Register.[1]

13.    Pursuant to Kuwait law Ford, as a foreign principal, must have a direct relationship with a local Kuwait agent, as it does here with AMG.  The parties are required to record their agreement in the Commercial Register in order for such agreement to be valid and enforceable. See, for example, Article (2) of Law No. (13) for year 2016.

14.    Under the serial agreements entered into between AMG and Ford , each of which were recorded in the Commercial Register, AMG (as required by Ford) built three (3) state of the art facilities in Kuwait and was  required to buy Ford Products from Ford and to market and service those Ford Products.

---

[1] It should be noted that Law No. (36) for year 1964 was revised by Law No. (13) for year 2016 in March 2016 and Articles (260-296) of the Kuwait CACR as amended By Law No. (13) 2016 remain in effect. The 2016 change in the CACR did not materially affect the parties here- as Ford's other efforts to circumvent Kuwait Regulatory Law have been thwarted. See **Exhibits M, N and O**.

15.     AMG built a thriving business and was extremely successful despite having to rebuild from scratch after the 1990/1 Gulf War and Iraq's occupation of Kuwait.

16.     Since Sheikh Hamad assumed the role of Managing Director of AMG in August 2000, AMG has: (a) invested approximately U.S. $300 million in promoting Ford and Lincoln brands; (b) received numerous performance awards (e.g., in 2004 despite Kuwait's small market of approximately 3 million people, AMG ranked as the fourth best-selling Ford dealer in the world); and (c) continued to invest in the business and its facilities (e.g., within the last sixteen (16) months alone AMG    invested more than $5 million to upgrade its showrooms and facilities in Shuwaikh, Jahra, and Amadi).

17.     On or about May 2, 2005, Ford and AMG reaffirmed their relationship by entering into an agreement for AMG to continue to be the sole representative in Kuwait for the Ford, Lincoln and Mercury brands.  The GIDSSA was recorded in the Commercial Register.  A copy of the 2005 GIDSSA is attached hereto as **Exhibit B**.

18.     Pursuant to paragraph G. (i) of the GIDSSA, the parties agreed the GIDSSA would continue in full force and effect "until terminated by either party under the provisions of paragraph 13 of the Standard Provisions."  In other words

the GIDSSA had no termination date, and consistent with Michigan and Kuwait law, the parties agreed the relationship would continue indefinitely.

**B.**    **AMG and Ford Establish Their Duties Through Course of Performance**

19.     After Ford submitted to Kuwait law and made AMG its sole representative for Ford/Lincoln/Mercury in Kuwait, AMG remained loyal to Ford and invested large sums of money to enhance the brands.

20.     For approximately 20 years, with Roy Watson as its General Manager, AMG enjoyed a good working relationship with Ford through Ford's regional sales office Ford Middle East ("FME").

21.     From 2005 through 2013, Ford and AMG engaged in a course of performance under the GIDSSA wherein AMG (through the guidance of Mr. Watson) and Ford (through the guidance of FME's sales directors) would negotiate annual sales targets, jointly agreeing on reasonable sales targets by models and volume.

22.     This course of performance continued annually and communications were extensive with exchanges by email, phone and face to face meetings, with final decisions regarding sales targets and model mix made and agreed to by the parties well in advance of the time by which AMG had to submit its vehicle orders for the coming year.

23.    This course of performance was critical because it established how the terms of the GIDSSA related to sales performance objectives and how the evaluation of AMG under paragraph 2 (a) of the GIDSSA was to be performed; it also helped Ford determine what vehicles it would schedule for manufacture. This course of performance provided AMG the opportunity to plan, budget and order vehicles popular in Kuwait.

24.    Another example of how the course of performance established the expectation of the parties under the GIDSSA is that Ford considered eliminating production of the 8-cylinder Expedition, but after substantial communication with dealers, including AMG, Ford continued to produce these vehicles for a period of time for dealers in the Gulf region where the vehicle was popular.

## C.    Ford Breaches the GIDSSA

25.    In 2010 Ford decided to close its Mercury division effective 2011, eliminating vehicles that were high volume sellers for AMG in Kuwait, in an effort to increase its own profitability, at the expense of AMG.  In 2010, Mercury vehicles accounted for nearly a quarter of AMG's total new car sales.

26.    In 2011 Ford made another unilateral decision that adversely impacted AMG's sales in an effort to enhance its own profitability when it stopped manufacturing the Crown Victoria effective 2012. AMG purchased 2000 units at the close of production to carry it as far as possible.

8

27.    In 2014, without consulting AMG or other Gulf dealers, and inconsistent with the course of performance, Ford unilaterally eliminated the larger 8-cylinder Expedition from its production.

28.    Fuel economy is not a concern in Kuwait,  where through August 2016 gasoline cost 35 cents a gallon Until approximately 2012-2013 roughly 50% of AMG's sales were attributable to now discontinued models for which Ford provided no replacement.

29.    AMG's closest competitor in Kuwait is General Motors ("GM") which continues to produce the 8-cylinder Tahoe, Yukon, Suburban etc. As Ford eliminated competitive models, Kuwaiti customers moved to the products they like: large vehicles with large engines.

30.    After eliminating approximately 50% of AMG's bestselling Ford Products, Ford breached its duty under paragraph 2.(a)(1) of the GIDSSA (requiring Ford to set "reasonable criteria" to evaluate sales), and continued to evaluate AMG's performance against GM and other manufacturers as though no elimination of popular products had occurred.

31.    Further,  in evaluating AMG's sales performance Ford breached its duty under paragraph 13(c)(5) of the GIDSSA to consider the impact and AMG's inability to "cure" a problem created when the Kuwait government temporarily

impeded access to AMG's main showroom with a highway construction project, severely restricting customer access.

32.    Ford continued to breach its duty under paragraph 13(c)(5) of the GIDSSA by failing to consider  the significant appreciation of the U.S. dollar that made Ford Products more expensive relative to the products of other manufacturers, declining oil prices and corresponding Kuwaiti austerity measures or the increasing regional political instability, all of which  adversely impacted AMG's sales and which AMG had no ability to "cure".

33.    Nevertheless AMG remained loyal to Ford and redoubled its efforts, expending large sums of money to upgrade facilities and to market and promote the Ford and Lincoln brands.

34.    For the foregoing reasons, as well as others identified below (all outside of AMG's control and for the most part within the control of Ford), AMG's new car sales in 2014 were 14% below the arbitrary and unreasonable target set by Ford in violation of paragraphs 2 and 13 of the GIDSSA (both of which require Ford to apply reasonable criteria).

35.    In spite of these issues, AMG received Ford's best service award for 2015/16 and continued as one of the leaders in spare parts sales in the Middle East and North Africa.

**D.   Ford Continues to Breach the GIDSSA As It Sets AMG Up For Termination**

36.     Beginning in the latter half of 2013, Ford's new Dubai-based management team of Mr. Kalyana Sivagnam and Mr. Thierry Sabbagh unilaterally changed the course of performance between the parties.

37.     Through 2013 Ford and AMG together evaluated AMG's sales performance against the Gulf Cooperation Council ("GCC") Ford dealers that made up the FME region: Saudi Arabia, UAE, Kuwait, Qatar, Oman, and Bahrain.

38.     Effective as of January 1, 2014, however, Ford's FME sales unit was reorganized to encompass Ford operations in Africa.  Ford Middle East and Africa ("FMEA"), with headquarters in Dubai, became a new, independent business unit under the Ford umbrella.

39.     In January 2014 Ford formally announced the inauguration of FMEA, to dealers in North Africa, Sub-Saharan Africa, South Africa and the Middle East.   It also announced Ford's intent to launch 25 new models in the region by 2016 including Focus, Fusion, Ranger, etc. and stated Ford expected sales in the "Middle East & Africa to grow by 40% by the end of the decade… ." **Exhibits C and D.**

40.     In addition Ford announced it was opening 35 new dealerships within two (2) years within the FMEA region.  **Exhibit D.**

41.     Ford's management became dictatorial. Annual targets were set by Ford late in the year with virtually no input from AMG and even less input related to models it  could order or for consideration of the behavior patterns of Kuwaiti buyers.

42.     As a new Ford business unit or "profit center" FMEA had manufacturing plants located in South Africa within its portfolio and FMEA needed to sell the models being manufactured at those plants regardless of what consumers in Kuwait demonstrated they wanted to purchase.

43.     AMG was forced to order models that were not popular in Kuwait (e.g. EcoSport, Figo, Ranger).

44.     AMG had to sell these unpopular vehicles at cost or at a loss, while spending a disproportionate amount on trying to market them. Simultaneously AMG incurred losses because Ford failed provide AMG with enough current product that was popular (e.g. Explorer, Edge  and Flex).  As previously stated, Ford had already completely stopped manufacturing the very popular Mercury line and Crown Victoria.

45.     Elimination of the above mentioned models and Ford's refusal to provide desirable models had the effect of dramatically reducing AMG's sales, seriously damaging its business and the reputation of Ford in Kuwait.

46.     Likewise, FMEA's refusal to confer with AMG on sales targets and inventory resulted in sales targets being set so late in the year[2] that it was impossible for AMG to order even the models Ford agreed to provide, much less meet the sales targets demanded.

47.     These issues, along with Ford's newly implemented dictatorial style, affected morale and caused AMG to lose some of its long standing sales management team.

48.     After breaching its duty as established through the parties' course of performance related to sales performance targets and inventory preference, and in violation of paragraphs 2(a)(1) and 13 of the GIDSSA,  Ford met with AMG's General Manager of 20 years, Mr. Roy Watson in the latter half of 2014.

49.     Ford told Mr. Watson that Ford was considering placing AMG on the Performance Improvement Program ("PIP") with an ostensible "cure period" citing AMG as being 14% below the arbitrary and unilateral sales target set by Ford. On information and belief, under Ford's own policies Ford may not terminate a dealer without placing the dealer on the PIP, identifying the areas in which a dealer is deficient and giving the dealer the opportunity to "cure" the deficiencies.  During the PIP Ford is required to assist the dealer in improving in the areas Ford identifies as needing improvement.

---

[2] The lag time between AMG's orders and actual delivery to Kuwait is approximately 6 months.

50.     Paragraph 2(a)(1) of the GIDSSA expressly requires Ford to apply "reasonable criteria" developed "from time to time as set forth in the Standards Manual". Paragraph 13 of the GIDSSA requires Ford to measure AMG's sales performance based on the "then current version of the Standards Manual". Paragraph 13 also requires Ford to notify AMG in writing of the specific failure to perform, promptly review the dealer's failures considering both Ford and the dealer's opinion as to what accounts for the identified alleged failure. Ford must then provide the dealer an opportunity to "cure" the identified failure.

51.     At the late 2014 meeting Mr. Watson was stunned to learn that Ford was considering putting AMG on the PIP and protested, requesting an extension of 90 days before initiating the PIP which Ford ostensibly granted. Ford had never informed AMG in writing it was considering placing it on the PIP, much less what date the PIP would begin.

52.     During that "extended" 90 day period Mr. Watson provided regular reports to Ford to which Ford failed and refused to respond.  Ford's silence misled Mr. Watson into believing that Ford was satisfied with AMG's progress towards resolution of the alleged problems identified by Ford.

**E.**   **Ford Sets Up AMG For Termination Under the Pretext of Placing AMG On the PIP With a Cure Period**

53.   On December 25, 2014, believing that Ford was largely satisfied with AMG's progress, Mr. Watson suggested a meeting with Mr. Sivagnanam, Sheikh Hamad, and himself in order to agree to a "road map" going forward.  **Exhibit E.**

54.   Seemingly confirming Mr. Watson's understanding, Mr. Sivagnanam agreed to meet in January, suggesting the parties agree to move forward "rather than look back".  **Exhibit E.**

55.   In January 2015 the referenced meeting was held at AMG's offices in Kuwait.  To Mr. Watson's complete surprise, AMG was officially placed on the PIP when Mr. Sivagnanam handed him the Notice of PIP after Sheikh Hamad had excused himself from the conversation.  **Exhibit F.**

56.   By placing AMG on the ostensible PIP, Ford yet again violated the GIDSSA when, with no regard for consumer preferences, it unilaterally placed arbitrary and unreasonable sales targets on AMG and ostensibly provided a 12 month "cure period" through December 2015.

57.   At about this same time  Ford "opined"[3] through Mr. Thierry Sabbagh (FMEA's Sales Manager) that Mr. Watson (AMG's long term, successful General Manager) was accountable for AMG's "failure" to satisfy Ford's arbitrary

---

[3] In pertinent part paragraph 13 (c) states that Ford will provide the "reasons which, in the Company's or Dealer's **opinion,** account for such failure … ." See **Exhibit B**.

and unreasonable sales targets and "opined" that if Mr. Watson was replaced with Mr. Richard Barber, a former associate of Mr. Sabbagh, AMG's "failure" would be "cured."

58.   AMG acceded to Ford's opinion that Mr. Watson should be terminated as General Manager and relied on Ford's opinion that he should be replaced with Mr. Barber, Ford's vouched for replacement.

59.   At Ford's behest, Mr. Barber (a former supervisor of Mr. Sabbagh at Mercedes) was appointed the General Manager of AMG in May 2015.

60.   With the "wolf in the hen house", AMG's sales deteriorated at an alarming rate, due significantly to Mr. Barber's replacing many of the senior members of the AMG team in a futile effort to make up for the failure of Ford to provide salable models that met the expectations of Kuwaiti consumers.

61.   Although AMG worked to get Mr. Barber up to speed, Mr. Barber abruptly quit without notice in August 2015 when AMG refused to give him absolute and unconditional control over AMG to the total exclusion of Sheikh Hamad, the principal of the company and the individual identified at paragraph F.(ii) of the GIDSSA as AMG's Managing Director.

62.   Since Ford's new FMEA management team had a practice of imputing onto Sheikh Hamad errors Ford allegedly perceived had been made by AMG's previous General Manager (Mr. Watson) and since under the GIDSSA he

16

was Managing Director and also owed fiduciary duties to AMG's shareholders, Sheikh Hamad tried to find a balance in AMG's management structure while authorizing Mr. Barber to exercise his desired authority.

63.    While trying to accommodate Ford and strike the right balance, Sheikh Hamad asked Mr. Sabbagh what his role would be if all of Mr. Barber's conditions were accepted, Mr. Sabbagh contemptuously threatened Sheikh Hamad directing him to **sit in his room or regret the consequences of failing to accept Mr. Barber's demands**.

## F.    Ford Becomes Openly Hostile While Ensuring AMG Will Not Meet Its Arbitrary and Unreasonable Demands

64.    Consistent with Mr. Sabbagh's threat to Sheikh Hamad,  Ford, through its managers Mr. Sivagnanam and Mr. Sabbagh, treated AMG contemptuously, offensively and with the clear intent to ensure AMG's demise.

65.    Although paying careful lip service to dealer autonomy in its correspondence, Ford simultaneously, through word and deed, made it clear that failure to follow its oral directives would result in speedy termination.

66.    After Mr. Barber's abrupt departure Ford's routine sales and service support largely ended.

67.    Instead of assisting AMG to meet its targets, Ford escalated its demands for AMG to meet increasingly arbitrary and unreasonable targets.

68.     One of many examples of Ford's open contempt and hostility took place at an October 2015 meeting in Kuwait while AMG was making a PowerPoint presentation and both Mr. Sivagnanam and Mr. Sabbagh actively ignored the presenter, deliberately focusing their attention on their smart phones and mobile devices. Their behavior throughout the meeting was so overtly disrespectful and deliberately orchestrated that AMG's third General Manager in 2015 (Mr. Barber's replacement) concluded that AMG had no future with Ford and resigned a few days later along with other senior managers who left for the same reason

69.     In early November 2015 (while still ostensibly on the PIP), having previously been invited by Ford to attend a major Ford-Lincoln event scheduled to coincide with the Dubai International Auto Show and after having made travel arrangements,  AMG was advised both orally and in writing that it was no longer welcome nor was it any longer  considered a Ford Dealer.  Mr. Sabbagh wrote:

> We can't stop you from travelling to Dubai; however, the Ford & Lincoln meetings which will be held next week are **private events that are restricted to the Dealers and people who are invited and approved by Ford Middle East Office.**  As mentioned in our previous note, we shall inform you shortly about our expectations for the next 60 days. (emphasis added)
> **See Exhibit H.**

70.     AMG's absence from the Dubai event was closely noted by associates, suppliers and bankers in the dealer community. AMG immediately became the subject of damaging rumors and innuendo in Kuwait and throughout

the Gulf. Moreover, Ford let it be known that AMG had specifically been disinvited, thereby intentionally damaging  Sheikh Hamad's reputation as well as AMG's standing and business prospects.

71.     Mr. Sabbagh's email as well as Ford's improper actions throughout 2015 show that Ford had predetermined it was terminating its relationship with AMG and that the PIP and "cure" was a ruse and a fraud.

72.     This ruse is further evidenced by the fact that, shortly after putting AMG in the PIP, Ford began to covertly interview candidates to replace AMG and continued to do so more openly in the second half of 2015, all while falsely representing that it would assist AMG with satisfying the arbitrary and unreasonable sales targets it had previously set.

73.     Finally, in a November 6, 2015 letter attached as **Exhibit G**, Ford stated that "success under the [PIP] program is no longer achievable," in blatant violation of the GIDSSA, and gave AMG another sham cure period.  Without consulting or considering why its targets were not being met and making no reference to the Standards Manual, Ford directed AMG to sell 3,057 units within 60 days in order to "cure" the alleged deficient sales. AMG's  average annual sales volume from 2010 through 2014 was 5,792 units.

## **The Family Dispute**

74.     For 20 years, Ford has known that two of the approved owners, Sheikh Hamad and his brother, Mr. Adnan Al-Wazzan, have been engaged in litigation related to an inheritance dispute involving not just ownership of AMG but also many other family businesses.

75.     This litigation had already been ongoing for almost 10 years and was well known to Ford when it signed and registered the 2005 GIDSSA.

76.     Based on its course of conduct and course of performance Ford has waived any objection related to the ownership dispute.

77.     The conflict between the brothers has never affected proficient operation of the dealership and that has not changed.

78.     What has changed is Ford's involvement in this ongoing dispute which began when Ford's managers Mr. Sivagnanam and Mr. Sabbagh began meeting regularly with Mr. Adnan Al Wazzan, an owner who is not identified on paragraph F (ii)  of the GIDSSA as a person with managerial authority.

79.     Sheikh Hamad is both an approved owner and listed on paragraph F (ii) as the approved Managing Director. Under both the GIDSSA and AMG's articles of incorporation Sheikh Hamad has full managerial authority for the company.

80.     While Ford managers were colluding with Mr. Adnan Al-Wazzan, they began to impute to Sheikh Hamad potential attempted violations of the ownership provisions of the GIDSSA while participating in the leak of damaging rumors to the press and through social media (e.g., Mr. Adnan Al-Wazzan's creditor has acquired "52% of Ford").

81.     Sheikh Hamad assured  Ford that he and AMG were taking all necessary legal actions to prevent Mr. Adnan Al-Wazzan from violating the transfer provisions of the GIDSSA and the statutory preemption rights of other AMG shareholders. He plainly communicated to Ford that his brother's actions were illegal under Kuwaiti law.

82.     On or about June 16, 2015, FMEA managers visited Sheikh Hamad in his hospital room and threatened to terminate the GIDSSA if Sheikh Hamad did not reach a settlement with his brother within 60 days.

83.     Pursuant to Ford's demand, Sheikh Hamad attempted to consummate a settlement with his brother Adnan.  He sought Ford's approval for the purchase wherein Sheikh Hamad would buy his brother's purported 52% interest in AMG for approximately U.S. $170 million and Ford would amend the GIDSSA to reflect the change in ownership.

84.     Ford did not agree to Sheikh Hamad's request and instead continued its collusive meetings with Adnan Al-Wazzan, thus ensuring the brothers could not

21

reach an agreement, because the more Mr. Adnan Al-Wazzan communicated with Ford, the higher the price he demanded for his AMG shares.

85.     Moreover, Ford made placing a value on the ownership interest for settlement impossible because of the above described sham PIP, the escalating threat of termination, Ford's continual interference in AMG's management, and Ford's deliberate failure to discredit the most damaging rumors about AMG's termination and replacement with another Kuwaiti dealer, which leaked every time Ford met with such potential dealers.

## A.    <u>The Inevitable Termination</u>

86.     When Ford put AMG on the ostensible PIP and required AMG to "cure" problems created and controlled by Ford, termination of the relationship was inevitable.

87.     Ford's behavior throughout the "cure period" belies Fords' written representation that AMG could cure what Ford was representing as "failure to fulfill duties" under the GIDSSA.

88.      On January 5, 2016, after months of confusion and frustration, Sheikh Hamad wrote to Mr. Edsel B. Ford, II (a member of Ford's Board of Directors) requesting an investigation into the pattern of unethical and unlawful conduct by FMEA managers, Mr. Sivagnanam and Mr. Sabbagh. **Exhibit I.**

89.     Without investigating as requested, Ford's Vice President of Legal Affairs responded to the letter by demanding a meeting pursuant to paragraph 14 of the GIDSSA claiming the "accusations" fell within the category of a dispute that cannot be resolved without a meeting. **Exhibit J.**

90.     Sheikh Hamad replied, agreeing to the meeting on the basis that Ford advise who was attending, their positions and the scope of their authority. Sheikh Hamad also noted that he had confirmed that Alghanim Auto Company ("Alghanim") had been incorporated in November 2015 by the son of the owners of the General Motors dealership.  He advised that it was generally understood in the Kuwait business community that Alghanim had been selected by Ford months earlier to take AMG's place in Kuwait. **Exhibit K.**

91.     Ford refused to provide the information Sheikh Hamad requested. The meeting never occurred.

92.     On March 14, 2016 Ford issued a termination letter to AMG (**Exhibit L**) which it did not deliver until March 28, 2016.

93.     One week before Ford delivered the termination letter to AMG it had arranged for the U.S. State Department to authenticate a new GIDSSA appointing Alghanim as Ford's authorized Kuwait dealer. (**Exhibit M**). The Alghanim GIDSSA was, however, subsequently dated March 27th, one day before notice of termination was delivered to AMG.

94.     This timing of these actions was part of a carefully calibrated plan by Ford and Alghanim to circumvent Kuwait law and Ministry of Commerce and Industry registration requirements. The plan ultimately failed. Alghanim and Ford were not permitted to record their contract in the Commercial Register. **Exhibits N, O and Composite Exhibit P.**

95.     Subsequently, by letter dated June 29, 2016,   **(Exhibit Q)**, Ford unethically and in bad faith: (a) notified AMG that it was exercising its option not to repurchase Ford Products it had required AMG to purchase;  (b) directed AMG to misrepresent to Kuwait customers that the hundreds of remaining new vehicles in its inventory must be sold as "used," when AMG was required to purchase them from Ford as "new" with the expectation of earning  a fair return on its investment; (c) refused to reimburse AMG for warranty and recall repairs after July 27, 2016 when AMG is the only Ford dealer who can legally provide these parts and services under Kuwait law; (d) refused to reimburse AMG for warranty and recall repairs when AMG is required to continue to perform warranty and recall repair for Ford Products for 6 months (CACR (13) 2016, Article 10) after  the effective date of termination; and (e) directed AMG to remove all Ford signs and logos, etc. in conjunction with Ford's refusal to authorize AMG to perform warranty and recall repairs for Kuwaiti Ford customers. Such instructions  not only violate Kuwaiti law but also create a massive safety issue for Ford consumers in Kuwait.

96.    Ford confirmed its blatant disregard for the laws of Kuwait in its letter dated July 27, 2016 (**Exhibit S**).   By way of this letter, Ford is effectively ignoring 60,000 vehicles in operation, 23,000 vehicles under warranty and 23,000 vehicles subject to recall.

**B.**    **Ford Files For Arbitration Admitting There Is A Controversy**

97.    In conjunction  with the purported effective date of the Alghanim GIDSSA and delivery of the termination letter to AMG, Ford attempted to initiate arbitration proceedings. On March 31, 2016 a law firm representing Ford filed a Notice of Arbitration and Statement of Claim with the American Arbitration Association's International Centre for Dispute Resolution. This filing stated that there is an actual controversy as to whether Ford properly terminated the AMG GIDSSA and whether Ford is liable for damages.

98.    Ford's Notice of Arbitration  flies in the face of  the position Ford took in *FMC v Ghreiwati Auto and Orient Development General Trading Co., LLC*, Civ. 2:12-cv-14313 (U.S.D.C. ED Mich., Southern Div.) wherein Ford refused to arbitrate relying on 15 U.S.C. § 1226.  **See Exhibit R attached.**

**C.**    **With Conscious Disregard, Ford Continues to Blatantly Violate the Laws and Public Policy of Kuwait**

99.    Notwithstanding Ford's commitment to comply with the regulatory laws and public policy of Kuwait by expressly agreeing to submit to courts in Kuwait in paragraph 20 of the 1986 agreement attached as **Exhibit A**, by recording

each of its agreements with AMG in the Commercial Register, , and by doing business in Kuwait, Ford has blatantly disregarded those laws and Kuwait public policy This has caused devastating confusion and damage to AMG and citizens and residents of Kuwait who have purchased Ford Products.

100.   Not only has Ford illegally terminated its relationship with AMG under Michigan law as well as Kuwait law, but Ford also colluded with Alghanim to replace AMG in Kuwait in violation of Kuwait law and public policy in order to circumvent its clear statutory obligation to compensate AMG. **Exhibits O and P** **c**onfirm Ford acted illegally and cannot record its agreement with Alghanim in the Commercial Register; thereby leaving AMG as the only authorized Ford dealer in Kuwait. (See CACR as amended (13) 2016, Article 9.)

101.   Because of Ford's blatant illegal behavior the citizens and residents of Kuwait have no legal Ford representative to handle warranty and recall repair service.

102.   AMG has continued to perform the required warranty and recall work for the citizens and residents of Kuwait at its own expense. Ford wrongfully refuses to reimburse AMG.

## **FIRST CLAIM FOR RELIEF**

103.  AMG repeats and realleges each and every allegation in the above paragraphs as if fully set forth herein.

104.  The AMG GIDSSA is a "motor vehicle franchise contract" as that term is defined in 15 U.S.C. § 1226(a)(1)(B).

105.  The AMG controversy arises out of or relates to a motor vehicle contract within the meaning of 15 U.S.C. § 1226(a)(2).

106.  While the AMG GIDSSA provides for the use of arbitration to resolve controversies, under 15 U.S.C. § 1226(a)(2) arbitration may be used to settle any such controversy only if after such controversy arises all parties to the controversy consent in writing to use arbitration to settle such controversy.

107.  AMG did not consent in writing to use arbitration to settle the controversy after it arose.

108.  Accordingly, there exists no legally enforceable arbitration agreement between AMG and Ford with respect to the controversies.

109.  **Exhibit R** demonstrates that Ford maintained this very same position in this District Court in FMC v Ghreiwati Auto and Orient Development General Trading Co., LLC, Civ. 2:12-cv-14313 (U.S.D.C. Eastern Distr. of MI, Southern Div.)

110.   By reason of the foregoing AMG is entitled to an order enjoining the arbitration filed by Ford.

## SECOND CLAIM FOR RELIEF

111.   AMG repeats and realleges each and every allegation in the above paragraphs as if fully set forth herein.

112.   There is an actual case or controversy between the parties as to whether AMG has an obligation to arbitrate the Ford Controversy as well as the claims AMG raises in this complaint.

113.   By reason of the foregoing AMG is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, that it has no obligation to arbitrate the Ford Controversy or the claims AMG makes in this complaint.

## THIRD CLAIM FOR RELIEF

114.   AMG repeats and realleges each and every allegation in the above paragraphs as if fully set forth herein.

115.   Ford breached the GIDSSA by wrongfully terminating its relationship with AMG and exacerbated the breach by failing to perform its duties under the GIDSSA in good faith as required by Michigan law.

116.   Ford wrongfully terminated its relationship with AMG. Ford's ostensible   grounds  for  termination  (that  AMG  failed  to  satisfy  its  sales obligations;  that  AMG  made  unauthorized  changes  to  its  ownership  or

management;  and that the GIDSSA is terminable at will) have  no  basis  in  fact  or law.

117.   The grounds Ford cites for termination  are simply a pretext for its predetermined decision to terminate the AMG GIDSSA in order to surreptitiously implement its "One Ford" plan[4] and to do business with Alghanim in Kuwait.

### a. Sales

118.   Pursuant to paragraph 2.(a) of the 2005 GIDSSA Ford is required to measure AMG's performance:

> "by such reasonable criteria as the Company [Ford] may develop from time to time as set forth in the Standards Manual.  The Company will provide to the Dealer an evaluation of its performance under this paragraph 2(a) from time to time in accordance with the Standards Manual."  See **Exhibit B.**

119.   Beginning  at  least  in  the  third  quarter  of  2014  in  breach  of  this provision, Ford failed and refused to provide AMG evaluations based upon the Standards  Manual  or  to  inform  AMG  that  it  was  failing  to  comply  with  the performance criteria set forth in the Standards Manual[5].

120.   The facts clearly show that AMG was not under performing. Through 2013, FME evaluated AMG's  performance  as  compared  with  the  other  GCC dealers and AMG was performing well. Ford, with total disregard for the long sales

---

[4] See **Exhibits C** and **D** which identify Ford's global strategy and announce the creation of FMEA at the beginning of 2014.
[5] In the first quarter of 2014 AMG received praise for its sales performance.  **See Exhibit T.**

history based on  buyer preferences for large horsepower vehicles, began reducing the number of vehicle models with large engines that use large quantities of gas. The reduction of the popular models began with the announcement in 2010 that in 2011 Ford was eliminating the Mercury brand and continued with the elimination of the Crown Victoria and the large engine SUV's.  Those vehicles sold well in Kuwait and other GCC countries because gas prices throughout the GCC are low. After the elimination of those models AMG, as well as other GCC dealers began to lose sales.

121.   The "One Ford" plan called for the elimination of a number of the products consumers in Kuwait had shown a preference for, replacing them with products either not popular in Kuwait, or not available in sufficient quantities to enable AMG to achieve its sales targets.

122.   Without disclosing the specifics of its "One Ford" plan to AMG, Ford eliminated a number of popular models AMG was selling in Kuwait.  The "One Ford" plan expressly contemplates "aggressively restructure[ing]" so Ford can "operate profitably" through its plan to change its "model mix."  Consistent with its "One Ford" plan to "restructure", Ford replaced FME with FMEA and changed the "model mix" to models that it was now manufacturing in South Africa and that were not popular in Kuwait.

123.   Under the "One Ford" plan Ford "accelerate[d] development of new products" built in manufacturing plants in South Africa, which FMEA then forced on AMG and the other GCC dealers.  These new products were designed and built with total disregard for the buying preferences of AMG's customers.

124.   After organizing FMEA, in the third quarter of 2014 Ford, for the first time, indicated orally to AMG that it was not meeting Ford's "performance standards".  FMEA made no reference to the Standards Manual, the fact that its new Ford Products were not popular in Kuwait, or that FMEA could not provide the few models that were marketable in Kuwait.

125.   From the beginning of 2014, and simultaneous with the creation of FMEA, Ford refused to engage in any meaningful communications regarding AMG's sales performance, much less how Ford envisioned transitioning the Kuwait market into Ford's "One Ford" plan.  On information and belief, that is because under "One Ford," in addition to new products, Ford also intended to have a new "face" (i.e. a new dealer) in Kuwait to represent Ford.

126.   Instead of working with AMG to integrate Ford's new strategy including its new products into the Kuwait market, FMEA set AMG up for termination.

127.   FMEA began by setting arbitrary and unreasonable demands of AMG regarding buying and marketing Ford Products.

128.   Under FMEA it became unclear just what criteria and standards were used to establish sales targets and to evaluate AMG's sales performance, despite the express requirement in the GIDSSA to use "reasonable criteria" as set forth in the Standards Manual.

129.   In the third quarter of 2014, FMEA orally complained to AMG that its sales performance was not satisfactory; FMEA omitted any reference to the Standards Manual, the "One Ford" plan or the inclusion of African countries in FMEA.  Consumers in the African countries included in the FMEA have very different market preferences than consumers in the GCC and are more likely to purchase Ford's new products.

130.   After making its initial oral complaint, in January 2015 Ford put AMG on the PIP, clearly threatening termination if AMG did not satisfy FMEA's arbitrary and unreasonable sales standards.

131.   By threatening termination under the pretext that AMG's sales were unsatisfactory, Ford, set paragraph 13(c) of the GIDSSA in motion as part of its "game plan" to establish a "new face" in Kuwait. Ford, through FMEA, used the PIP not to assist AMG with improving sales performance as Ford represented, but rather to buy time to create a pattern of written correspondence to support Ford's intended termination, while also using that time to ensure that AMG's replacement

was ready to open for business when Ford actually terminated its relationship with AMG.

132.   Ford's November 6, 2015 letter attached as **Exhibit G** triggered paragraph 13(c) of the GIDSSA which states in pertinent part:

> The Company [Ford] shall notify the Dealer in writing of such failure or failures, will offer to review promptly with the Dealer the reasons which, in the Company's or Dealer's opinion account for such failure and will provide the Dealer with **a reasonable opportunity to cure the same**. If the Dealer fails or refuses to cure the same within sixty (60) days after such notice, the Company may terminate the Agreement by giving the Dealer sixty (60) days prior written notice of the effective date thereof."

(emphasis added) See **Exhibit B**, 2005 GIDSSA, paragraphs 13 (c) and 2(a)(1).

133.   The facts demonstrate that Ford, through its FMEA business unit, breached each of the duties Ford placed on itself as identified in paragraphs 2(a)(1) and 13(c) of the 2005 GIDSSA, as well as its duty to act in good faith, by setting unreasonable and unattainable sales objectives; failing and refusing to provide a "reasonable opportunity to cure" and by providing an opinion (pursuant to paragraph 13 of the 2005 GIDSSA) regarding the hiring of Mr. Barber, who Ford indicated would cure the sales obligation of AMG.

### b. Ownership

134.   Ford's own actions belie the claim that Ford had any genuine concern related to the Al-Wazzan family inheritance dispute.

135.   Ford entered into the 2005 GIDSSA when it had known for many years of the ongoing litigation between Sheikh Hamad and his brothers.

136.   Yet, in support of Ford's global "One Ford" plan, which on information and belief, included having a "new face" (i.e. new dealer) in Kuwait, Ford violated its duty of good faith, and exploited the conflict between the brothers in order to bolster its predetermined decision to terminate the 2005 GIDSSA.

137.   In 2015, in direct conflict with its past course of performance related to the conflict between the brothers (but consistent with its goal of having a "new face" in Kuwait), Ford, through FMEA, demanded that Sheikh Hamad (while he was in his hospital bed) settle the conflict with his brother, Adnan Al Wazzan, within sixty (60) days or Ford would terminate its relationship with AMG.

138.   The facts alleged above clearly demonstrate Ford's improper interference with the brothers' negotiations, ensured the brothers would not to be able to resolve the conflict, and thereby created a manufactured grounds for termination.

139.   The conflict between the brothers never impaired AMG's performance.   The reputation of Ford and the management of AMG was stable until Ford, violating its duty of good faith, destabilized AMG and injured both AMG's and Ford's reputations by: (i) improperly intervening in the ongoing conflict between the brothers as identified above, (ii) falsely "opining" that placing

Mr. Barber (a colleague of FMEA management) into AMG management would "cure" AMG's alleged sales deficiency ; and (iii) blatantly violating the laws and public policies of Kuwait as identified in the allegations and exhibits discussed above.

### c. At Will

140.  Having done business in Kuwait since 1986, Ford knows or should have known that terminating the GIDSSA "at will" is a violation of both Kuwait law and fundamental Kuwait public policy.

141.  In order to do business in Kuwait the parties to a commercial agreement, including the GIDSSA in this case, are required to comply with the commercial regulations of Kuwait.  In 2005 when the GIDSSA was recorded in the Commercial Register, Kuwait Law No. (36) 1964 applied.  It was revised in March of 2016 by Law No. (13) 2016.  Nonetheless, neither of the laws permit a principal/franchisor to terminate an agent "at will" in Kuwait.

142.  Article (281) (1), which applies to the parties in this case , states:

> The contract agency shall be concluded for the benefit of both parties jointly.  The principal may not terminate the contract without fault on the part of the agent, otherwise he shall be liable to compensate him for the damage he suffers as a result of his remuneration.  Any agreement contradictory to this shall be void.

143.   Likewise Article (275)  which applies to the parties in this case states:

> If it is stipulated in the contract that the agent shall establish showroom buildings, commodity stores or installations for maintenance or repairs, the duration of the contract may not be less than five years.

144.   AMG, pursuant to the GIDSSA and requirement of Ford, spent more than $5 million to upgrade facilities in three cities within the last 16 months. Ford's "at will" provision is illegal and unenforceable because under Article (275) the contract may not be terminated for five years.  Additionally, the "at will" provision is illegal and unenforceable under Article (281)(1) because the GIDSSA cannot be terminated absent substantial fault on the part of AMG.

### d. Violation of Good Faith

145.   Ford's unilateral actions to change the course of performance of the parties, Ford's refusal to communicate with AMG regarding Ford's decision to change its Ford Products model mix, Ford's refusal to assist AMG with a solution to the unsalable model line-up Ford created, Ford's improper interference with AMG's management, Ford's improper interference in the family dispute, Ford's imposition of  arbitrary and unreasonable sales performance standards, Ford's refusal to permit AMG to attend the Dubai dealer event in November of 2015 when AMG was still Ford's dealer and ostensibly able to cure the alleged sales deficiency, and Ford's arbitrarily cutting short the sham PIP in the November 6, 2015 letter, providing an illusory sixty day (60) cure period applying the same

36

sales target the letter said could not be satisfied, are all actions demonstrating Ford breached its duty to perform under the GIDSSA in good faith.

146.   After Ford terminated AMG, it had the opportunity to mitigate the damage it caused AMG but instead continued to engage in a violation of its duty of good faith by exacerbating AMG's damages, sending the June 29, 2016 letter (**Exhibit Q**) advising that Ford was not exercising its right to buy back the new unpopular product AMG had been required to purchase.

147.   Ford also violated its duty of good faith by refusing to reimburse AMG for warranty and recall work to be performed on Ford Products purchased by Ford customers in Kuwait when Ford knows that AMG is required by Kuwait law to continue to perform such work, and that AMG is the only legal representative authorized to perform that work in Kuwait.

148.   Further breaches of Ford's duty to perform its duties under the GIDSSA in good faith include Ford's blatant disregard of judicial orders, law and public policies, and its reckless abandonment of the consumers in Kuwait who purchased Ford Products.

## **FOURTH CLAIM FOR RELIEF**

149.   AMG repeats and realleges each and every allegation in the above paragraphs as if fully set forth herein.

150.  Ford, through FMEA, committed silent fraud by failing to disclose material facts, with the intent to mislead AMG. AMG relied on FMEA's misrepresentation and suffered damages as a result.

151.  Ford's stated goals were the "restructuring" of Ford's operations for the purpose, in pertinent part, of restructuring Ford's business units globally and accelerating the development of new products to be marketed globally.  Ford, through FMEA, withheld from AMG its intentions to ignore the regional buying preferences of Kuwaiti consumers which had been established through course of performance for many decades.

152.  Ford unilaterally changed the course of performance between itself and AMG by becoming dictatorial, arbitrary and unreasonable instead of cooperative and informative.  Ford's course of action was to place economy of scale above regional consumer buying preferences, resulting in a drastic reduction in sales of Ford product in the Kuwait market.

153.  While Ford announced the introduction of FMEA in 2014 as part of its restructuring plan, it withheld from AMG the importance of this change.  It failed to disclose to AMG that its product mix would no longer take into consideration regional buying preferences nor would its management personnel work jointly with  GCC dealers (AMG included) to ensure that the dealers had enough salable products available to them to reach sales targets.

154.   Ford's intentional failure to disclose this new strategy was designed to mislead AMG to believe that its relationship with FMEA was the same or similar to the relationship AMG had established with FME.  On information and belief, Ford's "silent" strategy also included replacing AMG in Kuwait with a new dealer to represent the new "One Ford" model mix that was not popular in Kuwait.

155.   Ford's silence on this plan intentionally misled AMG to rely on its course of performance with FME regarding the ordering of product, upgrading its facilities, marketing Ford Products and believing that FMEA would engage in a good faith cooperative effort to produce, market and sell Ford products in demand in Kuwait.

156.   Ford's intentional failure to disclose caused AMG to rely on its misrepresentation, causing   AMG damages including investing more than $5 million in new facilities and ordering large quantities of unpopular new product in 2015 that AMG was ultimately directed by Ford to sell as used.

157.   In addition, Ford committed silent fraud by failing to disclose that it was replacing AMG with Alghanim as its agent in Kuwait. Ford intentionally failed to disclose: that it was visiting Alghanim in Kuwait on Alghanim visas while AMG was still a Ford dealer in Kuwait; that Alghanim had established a new company to represent Ford in Kuwait, and; that the sales criteria Ford set in the sham PIP were unachievable.

158.  Ford's silence on these material facts misled AMG into believing it would continue as Ford's representative in Kuwait, that Ford would assist AMG in satisfying Ford's arbitrary and unreasonable sales criteria identified in the sham PIP.

159.  In reliance on this misrepresentation AMG ordered large quantities of new vehicles, invested large sums of money marketing Ford Products, maintained a large inventory of Ford Products, and represented to the Kuwait public that AMG would remain responsible for the warranty and recall service and repair of Ford Products.

160.  In reliance on Ford's intentional misleading failure to disclose, AMG suffered damages to its reputation (as well as damage to the reputation of its principal and managing director) and suffered substantial financial damage.  These damages continue because Ford refuses to reimburse AMG for warranty and recall work on Ford Products purchased by Kuwait consumers.

161.  Further, during the time Ford was committing silent fraud and AMG was also under the sham PIP and/or the sham "cure period," Ford humiliated and caused tremendous injury to both AMG's and Sheikh Hamad's reputation with colleagues, bankers and the business community in the GCC when Ford "disinvited" and refused to permit AMG to attend a dealer event for all Lincoln and Ford dealers in the GCC.

162.   AMG is entitled to compensatory as well as punitive damages because Ford's silent fraud was willful and wanton and, by design and effect, caused injury to the reputation of AMG and Sheikh Hamad.

## FIFTH CLAIM FOR RELIEF

163.   AMG repeats and realleges each and every allegation in the above paragraphs as if fully set forth herein.

164.   Ford, fraudulently misrepresented to AMG that it was putting AMG on the "PIP" for the purpose of providing AMG the  opportunity to "cure" alleged deficiencies in its sales performance.

165.   When Ford delivered the PIP letter, it knew that its representation that AMG could "cure" the alleged deficiencies was false.

166.   Ford knew that the sales performance criteria imposed on AMG could not be satisfied with the new model mix available; FMEA knew its sales performance criteria for 2015 did not comply with the GIDSSA;  FMEA knew that AMG could not "cure" the alleged deficiencies that were not under the its control.

167.    Ford and FMEA controlled not only the criteria utilized to evaluate AMG's sales performance, but also the model mix available, and provided no reasonable assistance or plan regarding how AMG could and should integrate the new Ford Products into the Kuwait market.  AMG acted on FMEA's demand that AMG's long time General Manager be terminated and replaced with an associate

of one of FMEA's senior management, based on the representation that Ford's vouched for General Manager ensured the terms of PIP would be met.

168.   In reliance on Ford's fraudulent misrepresentations, AMG purchased large quantities of Ford Products that were not popular in Kuwait, spent enormous amounts of money to market these unpopular products and continued to represent to its current and prospective customers that it would provide all needed warranty and recall work.

169.   When it required AMG to purchase large quantities of unpopular Ford Products, Ford knew that AMG could not sell those products at a profit during the PIP, regardless of the hiring of Mr. Barber, or the amount AMG spent on marketing.

170.   As a result of its reliance on Ford's fraudulent misrepresentations, AMG was, and continues to be, damaged.

171.   Ford fraudulently misrepresented that if AMG upgraded its facilities, AMG could continue to use the upgraded facilities for the sale and service of Ford Products in Kuwait and expect a fair return on its investment.

172.   In reliance on Ford's representations and in compliance with Ford's demands, AMG upgraded all three facilities, completing the upgrades ahead of Ford's schedule and at a cost to AMG of more than $5 million.

173.   Months after these upgrades were complete, Ford placed AMG on the sham PIP.

174.   AMG's reliance on Ford and FMEA's fraudulent misrepresentations caused and continues to cause AMG substantial damage The fraud was willful and wanton, orchestrated in a manner to humiliate and cause injury to the reputations of AMG and Sheikh Hamad.

175.   AMG is entitled to an award of compensatory and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, AMG respectfully requests this Court for the following relief:

(i)    On the First Claim, preliminary and permanent injunctive relief enjoining the Ford Motor Company arbitration;

(ii)   on the Second Claim, a declaratory judgment, pursuant to 28 U.S.C. § 2201, that AMG has no obligation to arbitrate the controversy with Ford Motor Company;

(iii)   on the Third Claim that Ford Motor Company wrongfully terminated its relationship with AMG and breached the Global Importer Sales and Service Agreement, as well as its duty to perform that agreement in good faith, and wrongfully terminated its relationship with AMG, and AMG is entitled to an award of compensatory damages therefore;

(iv)    on the Fourth Claim that Ford Motor Company committed silent fraud reasonably relied on by AMG causing AMG substantial damage and the silent fraud is so egregious as to warrant both compensatory and punitive damages;

(v)     on the Fifth Claim that Ford Motor Company made fraudulent misrepresentations reasonably relied on by AMG causing AMG substantial damage and those fraudulent misrepresentations are so egregious as to warrant both compensatory and punitive damages.

Respectfully submitted,

By:     */s/ Loula Fuller*
        Dan Myers
        Loula Fuller
        Fuller & Myers Attorneys at Law
        Attorneys for Plaintiff
        106 E. College Ave., Suite 1450
        Tallahassee, FL  32301
        Off: (850) 577-0058
        lfuller@fuller-myers.com

Date: October 13, 2016

Respectfully submitted,

and

By:     */s/ John B. Alfs*
        John B. Alfs (P39094)
        CLARK HILL PLC
        Attorneys for Plaintiff
        151 S. Old Woodward, Suite 200
        Birmingham, MI  48009
        (248) 988-5841
        jalfs@clarkhill.com

Date: October 13, 2016

44