UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARABIAN MOTORS GROUP W.L.L.,

     Plaintiff,                          Case No. 16-cv-13655
                                             Hon. Matthew F. Leitman

v.

FORD MOTOR COMPANY,

     Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION TO STAY ARBITRATION (ECF #5)

In 2005, Plaintiff Arabian Motors Group W.L.L. ("Arabian Motors"), a Kuwaiti automobile dealer, and Defendant Ford Motor Company ("Ford") entered into an agreement under which Ford sold vehicles to Arabian Motors for resale to customers in the Middle East (the "Resale Agreement"). The Resale Agreement contains an arbitration provision that requires the parties to arbitrate certain disputes related to the agreement. After a dispute between the parties arose, Ford commenced arbitration. Arabian Motors contends that it cannot be compelled to arbitrate its dispute with Ford, and it now moves the Court to enjoin Ford from proceeding with the arbitration (the "Motion"). (*See* ECF #5.)

Before the Court considers Arabian Motors' request for an injunction, it must answer a preliminary question: who should decide whether Arabian Motors

1

can be compelled to arbitrate its dispute with Ford – the Court or the arbitrator? The Resale Agreement incorporates arbitration rules that delegate questions of arbitrability to the arbitrator, and such a delegation would ordinarily require Arabian Motors to submit its objection to arbitration to the arbitrator rather than to the Court.   But Arabian Motors says that a federal statute, the Motor Vehicle Franchise Contract Arbitration Fairness Act (the "Fairness Act" or the "Act"), 15 U.S.C. § 1226, renders the delegation unenforceable.  The Court disagrees.  For the reasons explained below, the Fairness Act does not apply to contracts – like the Resale Agreement – between manufacturers and *foreign* dealers.  Therefore, the parties' agreement to delegate questions of arbitrability to the arbitrator remains enforceable, and the arbitrator, *not the Court*, must decide whether Arabian Motors can be compelled to arbitrate its dispute with Ford.  Accordingly, the Motion is **DENIED.**

## I

## A

Arabian Motors is a corporation organized under the laws of Kuwait. (*See* ECF #5-1 at 2, Pg. ID 225.)  Ford is an automobile manufacturer headquartered in Dearborn, Michigan. (*See id.*)  On May 2, 2005, Arabian Motors and Ford entered into the Resale Agreement in Dearborn, Michigan. (*See id.*)   The Resale

Agreement appoints Arabian Motors as an authorized dealer of Ford products in Kuwait. (*See id*.)

In the Resale Agreement, Arabian Motors and Ford agreed to arbitrate any "dispute, claim or controversy … in connection with the breach, implementation, invalidity, or termination" of the Resale Agreement that the parties could not resolve through informal negotiations. (Resale Agmt. at ¶14, ECF #5-1 at 22-23, Pg. ID 245-46.)   Specifically, the parties agreed that any unresolved disputes would be subject to "binding arbitration in accordance with the United Nations Commission on Trade Law ["UNCITRAL"] Arbitration Rules in effect on the date" the Resale Agreement was executed. (*Id.* at ¶14(b), ECF #5-1 at 22-23, Pg. ID 245.)   Those rules provided, among other things, that "the arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objection with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." 1976 UNCITRAL Arbitration Rules, Rule 21.

**B**

The relationship between Arabian Motors and Ford apparently began to deteriorate in 2014.  Two years later, on March 14, 2016, Ford sent written notice to Arabian Motors terminating the Resale Agreement effective July 27, 2016 (the "Notice of Termination"). (*See* ECF #5-2 at 44-46, Pg. ID 295-97.)

3

On March 31, 2016, Ford submitted a Notice of Arbitration and Statement of Claim (the "Arbitration Demand") to the American Arbitration Association (the "AAA"). (*See* Arbitration Demand, ECF #5-2 at 2-16, Pg. ID 253-267.)   The Arbitration Demand sought a "declaratory judgment that Ford properly terminated the [Resale Agreement] for any and/or all reasons stated in the [Notice of Termination] and is not liable to [Arabian Motors] for terminating the [Resale Agreement] or relating to the course of dealings between Ford and [Arabian Motors]." (*Id.* at 15, Pg. ID 266.)   The AAA assigned the matter to arbitrator Lawrence S. Schaner (the "Arbitrator").

In email messages sent to the AAA on April 30, 2016, May 24, 2016, and September 6, 2016, Arabian Motors objected to arbitration on the grounds that (1) the dispute was not arbitrable and (2) the AAA lacked jurisdiction to decide whether Arabian Motors could be compelled to arbitrate. (*See* ECF #13-4 at 2, Pg. ID 494; ECF #5-3 at 2, Pg. ID 299; ECF #13-6 at 7-8, Pg. ID 503-504.)

On October 13, 2016, Arabian Motors filed a Complaint in this Court against Ford. (*See* Compl., ECF #1.)   In its Complaint, Arabian Motors seeks two types of relief.   First, Arabian Motors requests "preliminary and permanent injunctive relief enjoining the Ford Motor Company arbitration" and a declaratory judgement "that it [Arabian Motors] has no obligation to arbitrate [its dispute with Ford]." (*Id.* at 43-44, Pg. ID 43-44.)   Second, Arabian Motors seeks damages for

4

alleged breaches of the Resale Agreement and fraud by Ford. (*See id.* at 28-44, Pg. ID 28-44.)

On October 17, 2016, Arabian Motors filed the Motion in which it asks the Court to issue a preliminary injunction staying the arbitration on the ground that it cannot be compelled to arbitrate its dispute with Ford. (*See* ECF #5.)   Ford responded to the Motion on November 15, 2016. (*See* ECF #13.)   Arabian Motors filed a reply on November 29, 2016. (*See* ECF #16.)   The Court held a hearing on the Motion on December 14, 2016.

## II

When deciding whether to issue a preliminary injunction, the Court generally considers the following factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

However, before the Court applies these factors here, it must answer a preliminary question: who should decide whether Arabian Motors can be compelled to arbitrate its dispute with Ford?  If the Arbitrator must decide that question, then the Court may not enjoin the arbitration on the ground that Arabian

Motors cannot be compelled to arbitrate.  Thus, the Court begins with the question of who decides arbitrability.

### III

"[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  Generally, courts (rather than arbitrators) decide whether parties have agreed to submit a particular dispute or issue to arbitration.  The "default" rule "is that questions of arbitrability are the province of courts, not arbitrators." *Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc.*, 442 F.3d 471, 478 (6th Cir. 2006).

But there is a significant exception to this general rule.  Because arbitration is a "matter of contract," parties can "agree to submit the arbitrability question … to arbitration." *First Options*, 514 U.S. at 943.  Put differently, parties can "agree to arbitrate 'gateway' questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," rather than have a court decide such questions. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  However, "[c]ourts should not assume that parties agreed to arbitrate arbitrability unless there is clear and unmistakable

evidence that they did so." *First Options*, 514 U.S. at 944 (internal punctuation omitted).

Here, the Resale Agreement contains clear evidence that the parties intended to submit gateway questions of arbitrability to the Arbitrator. Among other things, the parties agreed in the Resale Agreement to conduct their arbitration in accordance with the then-governing UNCITRAL Arbitration Rules. (Resale Agmt. at ¶14(b), ECF #5-1 at 22, Pg. ID 245.) As noted above, those rules provided that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." 1976 UNCITRAL Arbitration Rules, Rule 21. Courts have consistently held that such an incorporation of the 1976 UNCITRAL Arbitration Rules is "clear and unmistakable evidence" that the parties agreed to arbitrate threshold issues of arbitrability. *See Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1073-75 (9th Cir. 2013) (collecting cases).[1] Arabian Motors does not contend otherwise. (For ease of reference, from this point forward, the Court refers to the language of the Resale Agreement incorporating the UNCITRAL rules as the "Delegation Provision.")

---

[1] While the United States Court of Appeals for the Sixth Circuit has not yet ruled on this question, the Court finds the authority cited above persuasive on this question.

Instead, Arabian Motors contends that the Court must decide the question of arbitrability because enforcement of the Delegation Provision would violate the Fairness Act. Because Arabian Motors is *specifically* attacking the Delegation Provision, the Court must determine whether that provision is enforceable. *See Rent-A-Center*, at 71-72 (holding that a federal court may rule on enforceability of a delegation provision only where it is specifically challenged and not where a party challenges validity of arbitration provision as a whole).[2] If the provision is enforceable, the parties must submit the question of arbitrability to the Arbitrator. *See Granite Rock Co.*, 561 U.S. at 299-300 (explaining that a "valid" delegation provision shifts the arbitrability question from a court to an arbitrator). Thus, the Court turns now to Arabian Motors' contention that the Fairness Act renders the Delegation Provision unenforceable.

## IV

The Fairness Act provides that "whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if *after* such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy." 15 U.S.C § 1226(a)(2) (emphasis added).

---

[2] During the hearing on the Motion, counsel for Arabian Motors explained that Arabian Motors is lodging a *specific* attack on the enforceability of the Delegation Provision and is not merely attacking the general enforceability of the entire arbitration provision in the Resale Agreement.

Arabian Motors insists that the Act precludes enforcement of the Delegation Provision because (1) the Act requires the post-dispute consent of all parties to submit any issue (including arbitrability) to an arbitrator but (2) the Delegation Provision purports to assign the issue of arbitrability to the arbitrator even though Arabian Motors has not given its post-dispute consent to such an assignment. (*See* ECF #5 at 15-26, Pg. ID 209-20.)  Ford counters that the Fairness Act does not apply to the Resale Agreement and that the Delegation Provision is therefore fully enforceable. (*See* ECF #13 at 20-27, Pg. ID 410-417.)  The viability of the Delegation Provision thus turns upon whether the Fairness Act applies to the Resale Agreement.  The Court concludes that it does not.

### A

The Fairness Act applies to one type of contract: a "motor vehicle franchise contract." 15 U.S.C. § 1226(a)(2).  This is a contract "under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles." 15 U.S.C. § 1226(a)(1)(B).  The Resale Agreement satisfies much of this definition.  It is an agreement under which Ford sold motor vehicles to Arabian Motors for resale to an ultimate purchaser.  Ford nonetheless contends that the Resale Agreement is not a "motor vehicle franchise contract" because that term does not include agreements between manufacturers

and foreign automobile dealers. (*See* ECF #13 at 20-27, Pg. ID 410-417.)   The Court agrees.

When assessing whether an agreement between a manufacturer and a foreign dealer may qualify as a "motor vehicle franchise contract," the Court looks first to the statutory definition of that term. *See United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) ("It is a well settled canon of statutory construction that when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.") (internal quotation marks omitted).   As noted above, the definition provides that the parties to a "motor vehicle franchise contract" are a manufacturer and "any other person." 15 U.S.C. § 1226(a)(1)(B).   At first blush, the phrase "any other person" would seem to include foreign dealers.   The term "person" as used in federal statutes generally includes both "corporations" and "companies," *see* The Dictionary Act, 1 U.S.C. § 1, and the broad reference to "any other person," if read literally, would appear to encompass foreign dealers organized in a corporate form.

But the Supreme Court has long cautioned against a literal reading of the term "any person":

> The words 'any person or persons' are broad enough to comprehend every human being.  But general words must not only be limited to cases within the jurisdiction of the

> state, but also to those objects to which the legislature
> intended to apply them.

*United States v. Palmer*, 16 U.S. 610, 631 (1818).  And while the Supreme Court

has recognized that "the word 'any' has an expansive meaning,'" *United States v.*

*Gonzales*, 520 U.S. 1, 5 (1997), the Court has reaffirmed that "a legislature that

uses the statutory phrase 'any person' may or may not mean to include 'persons'

outside 'the jurisdiction of the state.'" *Small v. United States*, 544 U.S. 385, 388

(2005) (quoting *Palmer*, 16 U.S. at 631); *see also Shady Grove Orthopedic*

*Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 453 (2010) (same).  Thus, when

Congress defined "motor vehicle franchise contract" to include agreements

between manufacturers and "any other person," it "may or may not" have meant to

include agreements with foreign dealers. *Small*, 544 U.S. at 388.  Accordingly, the

question of whether a contract between a manufacturer and a foreign dealer

qualifies as a "motor vehicle franchise contract" cannot be resolved by looking

solely to the "plain language" of the statutory definition.

**B**

So how should the Court determine whether the phrase "any other person"

as used in the definition of "motor vehicle franchise contract" includes foreign

dealers?  Ford suggests that the Court invoke "a canon of statutory construction

known as the presumption against extraterritoriality: Absent clearly expressed

congressional intent to the contrary, federal laws will be construed to have only

11

domestic application." *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090, 2100 (2016).   Ford says that application of this presumption compels the conclusion that Congress did not intend to include foreign dealers within the universe of "any other person[s]" covered by the Fairness Act. (*See* ECF #13 at 20-27, Pg. ID 410-417.)

However, it is not clear that the presumption applies here.  Federal courts "typically apply the presumption to discern whether an Act of Congress *regulating conduct* applies abroad." *Kiobel v. Dutch Petroleum*, 133 S.Ct. 1659, 1664 (2013) (emphasis added).   The Court questions whether the Fairness Act is best characterized as one that "regulates conduct."   The Act seems more accurately described as one that sets a pre-condition for the enforcement of certain contractual arbitration provisions.

The Court acknowledges that the presumption is not strictly limited to conduct-regulating statutes.  In *Kiobel*, for instance, the Supreme Court applied the presumption to the Alien Tort Statute, 28 U.S.C. § 1350, which gives district courts jurisdiction over "any civil action by an alien for tort only, committed in violation of the law of nations or a treaty of the United States." 133 S.Ct. at 1663-1665.   And in *RJR Nabisco*, the Supreme Court applied the presumption to a provision of the federal Racketeer Influenced and Corrupt Organizations Act that afforded relief for certain prohibited conduct (by creating a private cause of action)

but did not, itself, purport to regulate any conduct. *See RJR Nabisco*, 136 S.Ct. at 2101.  The Supreme Court explained that the presumption may apply "regardless of whether the statute in question [1] regulates conduct, [2] affords relief, or [3] merely confers jurisdiction." *Id.*  However, the Fairness Act is arguably not a perfect fit for any of these three categories, and thus it is not clear that this Court should apply the presumption to the Act.

In the end, this Court need not decide whether to apply the presumption to the Act.  Even when the presumption does not "apply directly," a "similar assumption" in favor of domestic application may be "appropriate" and may require a federal court to limit a statute's reach to domestic matters and subjects. *Small*, 544 U.S. at 389.  That is true here.

## C

### 1

The decision in *Small*, *supra*, provides a helpful framework for applying the "assumption" that Congress intended its statutes to reach only domestic subjects. *Small* involved a federal statute that made it "unlawful for any person … who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year … to … possess … any firearm." 18 U.S.C. 922(g)(1).  The Supreme Court addressed whether the phrase "in any court" applied "only to

13

convictions entered in any domestic court or to foreign convictions as well." *Small*, 544 U.S. at 387.

The Supreme Court explained that "the word 'any' considered alone cannot answer this question" because "in ordinary life" speakers often do not use that word in its strictest literal sense. *Id.* at 388. "[E]ven though the word 'any' demands a broad interpretation," the Supreme Court felt compelled to "look beyond that word itself." *Id.*

The Supreme Court found "help" construing the phrase "in any court" in the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* (quoting *Smith v. United States*, 507 U.S. 197, 204, n. 5 (1993)). That "notion," the Supreme Court explained, led to "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." *Id.* And even though that presumption did not "apply directly" – because the statute in question was being applied in a prosecution for domestic possession of a firearm – the Supreme Court deemed it "appropriate" to apply an "ordinary assumption" that Congress intends domestic application of its statutes. *Id.* at 389-91. The Supreme Court found that assumption "appropriate" because, among other things, "foreign convictions differ from domestic convictions in important ways." *Id.* at 389. The Supreme Court ultimately "assume[d] a

14

congressional intent that the phrase 'convicted in any court' applies domestically, not extraterritorially." *Id.* at 390-91.

The Supreme Court stood "ready to revise this assumption should statutory language, context, history, or purpose show the contrary." *Id.* at 391. But after analyzing these matters, the Supreme Court "found no convincing indication" that Congress intended the statute to reach foreign convictions, and the Supreme Court thus declined to override the assumption of domestic application. *Id.* The Supreme Court highlighted that "[t]he statute's language does not suggest any intent to reach beyond domestic convictions" or "mention foreign convictions," that the statute's "subject matter" was not "special" in a way that would make foreign convictions "seem especially relevant," and that the legislative history contained no indication that Congress intended to reach foreign convictions. *Id.* at 391-93.

As with the gun possession statute in *Small*, it makes good sense to assume that Congress enacted the Fairness Act with "domestic concerns" and domestic dealers in mind. Just as the "important" differences between foreign and domestic convictions in *Small* supported application of the assumption to the statute there, the significant differences between foreign and domestic dealers support application of the assumption to the Fairness Act. Domestic dealers occupy a far more important place in the American economy. They employ American workers, buy a wide range of products (beyond vehicles) from American suppliers, sell cars

and provide service to American customers, and often play important roles in their local economies. Foreign dealers do not. These key differences would be relevant to any consideration of whether to extend the Fairness Act to foreign dealers. Thus, as in *Small*, it is reasonable to apply the "ordinary assumption" that Congress did not have foreign dealers in mind when it enacted the Fairness Act. Indeed, the Court cannot conceive of any reason why Congress would have wanted to extend the protections of the Fairness Act to foreign dealers.[3]

## 2

The Court declines "to revise" its assumption because the available data provide no "convincing indication" that Congress intended to reach foreign dealers. *Small*, 544 U.S. at 391.

To begin, the Court rejects Arabian Motors' argument that the context of the Fairness Act clearly evidences a congressional intent to reach dealers beyond our borders. (*See* Arabian Motors Reply Br., ECF #16 at 10-12, Pg. ID 533-35.)

_____

[3] The Fairness Act stripped away a competitive advantage enjoyed by, among others, American automobile manufacturers. One can understand why Congress would have been concerned about American manufacturers using that advantage against American dealers – who, as noted above, comprise an important segment of the domestic economy. But the Court sees no reason why Congress would have been concerned about the prospect of American manufacturers using a competitive advantage against foreign dealers. When domestic manufacturers utilize advantages over foreign dealers, there is no direct harm to any segment of our economy. Indeed, there would seem to be a benefit to our economy when domestic manufacturers exercise their market power over foreign entities.

Arabian Motors' context-based argument is most easily understood when it is broken down into the following steps:

Step 1:   The Fairness Act is codified in Chapter 15 of the United States Code. *See* 15 U.S.C. § 1226.

Step 2:   Chapter 15 of the United States Code also includes a second act, the Automobile Dealers Day in Court Act (the "ADDCA"), 15 U.S.C. §§ 1221-25, which permits "automobile dealers" to bring certain claims against automobile manufacturers in federal court.[4]

Step 3:   The ADDCA's definition of an "automobile dealer" is expressly limited to domestic dealers: "any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c).

Step 4:   Congress could have, but did not, use the domestically-limited term "automobile dealer" in the Fairness Act. More specifically, Congress could have defined a covered "motor vehicle franchise contract" as one between an automobile manufacturer and a (necessarily-domestic) "automobile dealer." Instead, Congress defined the relevant contract as one between a manufacturer and "any other person."

---

[4] In relevant part, the ADDCA provides: "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 U.S.C. § 1222.

Step 5:    Under the maxim *expressio unius est exclusio alterius* – i.e., the expression of one thing is the exclusion of the other – the Court must presume that Congress' choice not to use the domestically-limited term "automobile dealer" in the Fairness Act reflects an intentional decision by Congress to apply the Act to foreign dealers.

(*See* ECF #16 at 10-12, Pg. ID 533-35.)

While this argument has some surface appeal, it also suffers from some weaknesses. First, as Arabian Motors acknowledges, the *expressio unius est exclusio alterius* canon applies "where Congress includes particular language in one section of a statute but omits in another section of the *same* act," (Arabian Motors Reply Br., ECF # 16 at 6, Pg. ID 534 (emphasis added), quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)), but Arabian Motors is relying on language in two *different* acts: the ADDCA (enacted in 1956) and the Fairness Act (enacted in 2002). Arabian Motors has not directed the Court to any persuasive evidence that Congress intended the Fairness Act to amend, or to become a part of, the ADDCA.[5] The distinctness of the ADCCA and the Fairness Act undercuts Arabian Motors' reliance on the *expressio unius est exclusio alterius* canon.

---

[5] The United States Court of Appeals for the Second Circuit has suggested in dicta that Congress enacted the Fairness Act as an "amendment to" and "a part" of the ADDCA. *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 235 (2d Cir. 2006). But the Second Circuit cited no authority for that proposition, and this Court has found none. As originally proposed, the Fairness Act provided that it was amending the Federal Arbitration Act (the "FAA"). *See* S. 1140 107th Cong. (2001) (Beginning the proposed bill with the words "To amend chapter 1 of title 9 [*i.e.*, the FAA]"); H.R. 1296, 107th Cong. (2001) (same). But the reference to the FAA was

Second, even if the Fairness Act and ADDCA could be considered part of a unified legislative scheme, the *expressio unius est exclusio alterius* canon would not necessarily have substantial value in construing the Fairness Act. The Fairness Act was adopted nearly fifty years after the ADDCA, and the canon appears to be less persuasive when applied to two acts passed far apart in time. In fact, the United States Court of Appeals for the First Circuit has called the canon a "pretty weak" aid in construing statutes "when it is applied to acts of Congress enacted at widely separated times." *Moreno Rios v. United States*, 256 F.2d 68, 71 (1st Cir. 1958).[6] The canon does not seem to have dispositive force here given the nearly 50 year gap between the ADDCA and the Fairness Act.

Finally, applying the *expressio unius est exclusio alterius* canon in the manner urged by Arabian Motors would attribute to Congress an inconsistency that

eliminated, and the final, adopted version of the Fairness Act did not specify that it was amending (or was intended to amend) any particular prior act of Congress. Nor did the final, approved version of the Act identify where Congress intended the Act to appear in the United States Code. The decision to place the Fairness Act in Chapter 15 of the United States Code appears to have been made by the Office of the Law Revision Counsel ("OLRC"), *not* by Congress. *See* 2 U.S.C. § 285b (declaring that one function of the OLRC is to "classify newly enacted provision of law to their proper positions in the Code where the titles involved have not yet been enacted into positive law").

[6] *See also United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) (en banc) (explaining that if a first statutory "provision was already part of the law, whereas the second is entirely new, Congress may have paid less attention to subtle differences between the two."); *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 373 (3d Cir. 1999) (declining to apply the canon in light of 20-year time lapse between the enactment of the statutes under consideration).

defies reasonable explanation.  Under Arabian Motors' application of the canon, Congress intentionally excluded foreign dealers from the protections of the ADDCA and then intentionally included those dealers in the Fairness Act's protections.  But why would Congress have given foreign dealers the right to resist arbitration in the Fairness Act after depriving them of the right to sue under the ADDCA?  Arabian Motors has not offered a satisfying response to that question.

For all of these reasons, the Court cannot accept Arabian Motors' application of the *expressio unius est exclusio alterius* canon to the Fairness Act, and the Court concludes that the context of the Fairness Act – whether viewed as part of the ADDCA or not – does not provide persuasive evidence that Congress intended to cover foreign dealers.  While Arabian Motors' contextual arguments are not unreasonable, they fall short of the "convincing indication" of congressional intent necessary to rebut the assumption of domestic application under *Small*. *Small* 544 U.S. at 391.

The Fairness Act's lengthy legislative history also provides no indication that the Act applies to foreign dealers. *See Small*, 544 U.S. at 393 (looking to legislative history when considering whether there was evidence to rebut assumption that Congress acted with a domestic focus).  For instance, the Senate Judiciary Committee's report on the Fairness Act emphasizes that Congress intended to preserve for dealers the range of dispute-resolution "remedies afforded

20

by State law," S. REP. NO. 107-266, at 2 (2002) (the "Senate Report"),[7] but such state-law remedies are generally *not* available for foreign dealers.[8]  Moreover, the Senate Report does not mention foreign dealers, cites survey data from the domestically-focused National Automobile Dealers Association, and includes only domestic motor vehicle dealers as examples of dealers harmed by mandatory arbitration clauses.  *See* S. REP. NO. 107-266, at 1-15 (2002).

---

[7] In relevant part, the Senate Report provides:

> This legislation would allow motor vehicle dealers the option of either going to arbitration or utilizing procedures and remedies available under State law such as those involving State-established administrative boards specifically created and uniquely equipped to resolve disputes between motor vehicle dealers and manufacturers.  This legislation is intended to ensure that motor vehicle dealers are not required to forfeit important rights and remedies afforded by State law as a condition of obtaining or renewing a motor vehicle franchise contract.

S. REP. NO. 107-266, at 2 (2002).  As noted above, after the Senate Report was issued, Congress eliminated from the Fairness Act all references to the FAA. Apart from that change, the language of the final, approved version of the Act matches the language in the bill at the time the Senate Judiciary Committee issued its report.

[8] *See e.g.*, Mich. Comp. Laws §445.1582 ("Notwithstanding the terms, provisions, or conditions of a dealer agreement, [the Michigan Dealer Act] shall have no application to dealers located outside the state of Michigan."); Tex. Occ. Code Ann. §§ 2301.002(16), 2301.453(e) (allowing a "franchised dealer" to file a protest with the board of the Texas Department of Motor Vehicles prior to the termination or discontinuance of its franchise contract, but limiting the definition of "franchised dealer" to only include dealers that are "licensed" by the State of Texas).

Nor does the legislative history beyond the Senate Report undermine the Court's assumption that Congress did not intend to reach foreign dealers. For instance, on March 1, 2000, the Senate Judiciary Committee's Subcommittee on Administrative Oversight and the Courts held a hearing on the Fairness Act, and there was no mention of foreign dealers. *See Overview of Contractual Mandatory Binding Arbitration: Hearing Before the Subcomm. on Administrative Oversight and the Courts of the S. Committee on the Judiciary*, 106th Cong. (2000) (the "Committee Hearing Transcript") (discussing the Fairness Act during the first half of the hearing).[9]   And on October 3, 2000, Representative Mary Bono, who introduced the Fairness Act in the House of Representatives, explained during a floor speech that the legislation was intended to protect "America's community auto dealers." 163 CONG. REC. H8688 (daily ed. October 3, 2000) (statement of Rep. Bono).   A subsequent floor speech by Representative William Delahunt underscored that the Fairness Act is "about preserving local businesses that are a cornerstone in our communities."   *Id.* at H8689 (Statement of Rep. Delahunt).

---

[9] Neither the 102-page transcript of the hearing nor the prepared testimony of the five witnesses mention foreign dealers.   Instead, the questions and testimony focused on the displacement of state-law protections and dispute-resolution mechanisms by manufacturers' use of mandatory arbitration clauses.   *See* Committee Hearing Transcript. Even Senator Jeff Sessions, who opposed the Fairness Act, focused his questions at the hearing on whether there were dealers *in the United States* who themselves were using mandatory arbitration clauses in their contracts with consumers. *See id.* at 42-43.

Finally, on October 2, 2002, Senator Russ Feingold stated on the floor of the Senate that the provisions of the Fairness Act "are very important to address a real unfairness that is being perpetrated on the auto dealers of *this country*." 148 CONG. REC. S9833 (daily ed. October 2, 2002) (statement of Sen. Feingold) (emphasis added).  Simply put, nothing in the Fairness Act's legislative history suggests that Congress intended the Act to cover foreign dealers.

In summary, the "statutory language, context, history, [and] purpose" of the Fairness Act do not provide a "convincing indication" that Congress intended the Fairness Act to reach foreign dealers, and the Court thus adheres to its "assumption" that Congress did not intend the Act to cover those dealers. *Small*, 544 U.S. at 391.  Because the Fairness Act does not apply to contracts – like the Resale Agreement – between manufacturers and foreign dealers, the Act does not preclude enforcement of the Delegation Provision.   Under that provision, the Arbitrator must decide whether Arabian Motors may be compelled to arbitrate its dispute with Ford.

## V

As a final argument, Arabian Motors asserts that Ford is judicially estopped from taking the position that the Fairness Act does not apply to contracts with foreign dealers because Ford took the opposite position in *Ford Motor Co. v. Ghreiwati Auto*, 945 F.Supp.2d 851 (E.D. Mich. Nov. 7, 2013). (*See* ECF #5 at 22-

26, Pg. ID 216-20.)   In *Ghreiwati*, two foreign automobile dealers filed for arbitration against Ford after it terminated its contracts (like the Resale Agreement) with the dealers. *See Ghreiwati*, 945 F.Supp.2d at 853-54.   In response, Ford sought to enjoin the arbitration on the grounds that: (1) the Fairness Act applies to contracts with foreign dealers; and (2) Ford did not consent to the arbitration filed by the *Ghreiwati* dealers.   *See id.*

Ford's position in *Ghreiwati* is plainly contrary to Ford's position here, but that does not mean that Ford is subject to judicial estoppel.   Judicial estoppel must be "applied with caution" and requires more than contradictory positions by a party in an earlier case. *Teledyne Industries, Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir. 1990).   "In order to invoke the doctrine of judicial estoppel, a party must show that the opponent took a contrary proceeding *under oath* in a prior proceeding and that prior position was accepted by the court." *Id.* (emphasis added).   Moreover, "[j]udicial estoppel . . . does not usually apply to shifting legal arguments; it typically applies to shifting factual arguments." *Law Office of John H. Eggersten P.C. v. C.I.R.*, 800 F.3d 758, 766 (6th Cir. 2015).

Ford's assertions in *Ghreiwati* concerning the scope of the Fairness Act were not under oath and were not factual claims.   Furthermore, for the reasons explained in Ford's response brief (*see* ECF #13 at 27-30, Pg. ID 417-20), the Court cannot conclude that the court in *Ghreiwati* accepted Ford's position that the Fairness Act

applies to foreign dealers. Because the elements of judicial estoppel are not satisfied, Ford remained free to argue in this case that the Fairness Act does not apply to the Delegation Provision.

## VI

For all of the reasons stated above, the Delegation Provision enforceable, and thus it is for the Arbitrator, not this Court, to rule on whether Arabian Motors may be compelled to arbitrate its dispute with Ford.[10]  Because this Court may not decide that question, it may not enjoin the arbitration between Ford and Arabian Motors on the basis requested by Arabian Motors.  Accordingly, the Motion (ECF #5) is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: January 19, 2017                  UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 19, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

---

[10] The Arbitrator has already concluded that the parties' dispute is arbitrable. (*See* Arbitrator's Interim Award on Jurisdiction, ECF #17-1.)  This Court will not disturb that ruling.